IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

JAKETRA BRYANT on behalf of her   *
minor child C.B.,
                                  *

     Plaintiff,
                                  *

vs.                                 CASE NO. 4:21-cv-205 (CDL)
                                *

CALVARY CHRISTIAN SCHOOL OF
COLUMBUS GEORGIA, INC.,        *

     Defendant.            *

_____

O R D E R

Plaintiff Jaketra Bryant alleges, on behalf of her minor son, C.B., that Defendant Calvary Christian School discriminated against C.B. because of his disabilities and race when Calvary dismissed him from school. Bryant asserts claims under 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.*; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Calvary moved for summary judgment on all of Bryant's claims. Also pending before the Court is Calvary's motion to exclude Bryant's expert. For the reasons that follow, Calvary's summary judgment motion (ECF No. 49) is granted. Because the Court grants Calvary's summary judgment motion, Calvary's motion to exclude Bryant's expert is terminated as moot (ECF No. 50).

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Bryant, the record reveals the following facts.

## I.   C.B.'s Enrollment and Sixth-Grade Year at Calvary

Defendant Calvary Christian is a private, Christian-affiliated school located in Columbus, Georgia.  Through its Discovery School Program, Calvary serves students who have learning difficulties.  C.B. is a black, former student at Calvary who first enrolled in the Discovery Program as a sixth grader.

To enroll in the Discovery Program, students generally must submit an Individual Education Plan ("IEP"), a 504 Plan, or a

psychological evaluation report.  Accordingly, Bryant, C.B.'s mother, had Dr. Kevin Weis, a clinical psychologist, conduct a psychological evaluation of C.B.  Dr. Weis diagnosed C.B. with Autism Spectrum Disorder ("autism") and Attention Deficit Hyperactivity Disorder ("ADHD").  Dr. Weis's evaluation report recommended that Calvary implement certain accommodations for C.B. at school, including teachers repeating directions multiple times, preferential seating in class, extra time on testing, and a behavior plan focusing on rewarding positive behaviors instead of punishing misbehaviors.  Further, Dr. Weis recommended that C.B. be evaluated by a physician to determine if he was an appropriate candidate for psychostimulants to better manage his ADHD and autism.

Bryant provided a condensed version of Dr. Weis's report along with his recommendations to Calvary.  Calvary crafted a Student Support Plan for C.B. based on that report.  Jones Decl. ¶ 15, ECF No. 49-6.  The Student Support Plan specified that Calvary would make certain accommodations available to C.B., including a positive reinforcement behavior plan, extra assistance with directions and instructions, preferential seating, extra time on testing, pre-test study guides, and a word bank on tests when possible.

In the fall of C.B.'s sixth-grade year, Pamela Jones, the Director of the Discovery Program, recommended that Bryant enroll

C.B. in Applied Behavioral Analysis ("ABA") therapy.   Director
Jones recommended ABA therapy for C.B. because other students had
benefitted from ABA interventions in the past and she thought he
would be a good candidate.  *Id.* ¶ 20.  She also encouraged Bryant
to have C.B. evaluated for psychostimulants by a physician, as Dr.
Weis had recommended.   Despite these recommendations, Bryant did
not enroll C.B. in ABA therapy or have C.B. evaluated for
medication at that time.   Bryant did not think it necessary to
enroll him in ABA therapy because he was behaving and performing
well academically.   Indeed, other than one incident where C.B.
kicked a trash can out of frustration from not finishing an
assignment, C.B. did not engage in serious misbehavior during his
sixth-grade year.

## II.  C.B.'s Seventh-Grade Year and Disciplinary History

C.B.'s behavioral problems accelerated during his seventh-
grade year when he enrolled in Kelly Cameron's math and study hall
classes within the Discovery Program.   Early in the school year,
C.B. was sent to the principal's office and received a negative
checkmark on his behavioral chart for "losing his temper and
throwing things in class."   Pl.'s Resp. to Def.'s Mot. Summ. J.
Ex. 19, C.B. Behavioral History 10, ECF No. 59-23.   Soon
thereafter, C.B. caused a classroom disruption after misusing his
laptop.   Bryant Dep. 199:7–200:18, ECF No. 54.   After that
incident, C.B. was sent home for the day.   Pl.'s Resp. to Def.'s

Mot. Summ. J. Ex. 20, C.B. Behavior Log 1, ECF No. 59-24.   The
next month, C.B. threw a pencil in class after becoming angry.   In
response, Calvary suspended C.B. for three days, instructed Bryant
to enroll him in ABA therapy, and again encouraged Bryant to have
C.B. evaluated by a physician for potential medication to help
manage his behavior.   Jones Decl. ¶¶ 24-25; Bryant Affidavit ¶ 27,
ECF No. 59-40.

During his escalation in misbehavior, C.B. and another
student told Bryant that some white students at school made
comments that "God hat[es] black people" and "God hat[es] gay
people."   Bryant Dep. 293:20-24.   After that incident, Bryant
noticed a decline in C.B.'s mood.   *Id.* at 294:20-295:2.   In a
conference discussing C.B.'s recent misbehavior, Bryant told
Director Jones about the white students' racially charged
comments, how they upset C.B., and how the incident may have caused
him to act out.   *Id.* at 294:17-295:17.   In the same conference,
Bryant maintains that Director Jones told her that C.B. needed to
be careful or he would "end up with his hands behind his back" in
another setting.   *Id.* at 287:7-288:2.

A few weeks after returning from suspension, C.B. threw a
calculator in class hard enough to break it.   After the calculator
incident, Calvary's Headmaster, Jim Koan, decided not to allow
C.B. to return in person to the classroom for the remainder of the
fall 2020 semester.   Rather than dismissing C.B., Headmaster Koan

allowed him to complete the semester through virtual instruction.

Virtual instruction did not work well for C.B., and he continued

to exhibit behavioral problems during class, such as paying

attention to other screens and missing required classes.  Cameron

Dep. 51:23-25, 56:17-57:1, 59:2-12, ECF No. 52.

## III. C.B.'s Dismissal from Calvary

Because all the parties agreed that C.B. learned more

effectively in the classroom, Bryant and Calvary worked together

on a plan so that C.B. could return to in-person classes.  As a

condition of eventually returning in person to campus, Headmaster

Koan told Bryant that C.B. must complete ABA therapy in a "public

school or . . . classroom setting" other than Calvary during the

spring 2021 semester.  Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 11,

Email from Koan to Bryant (Dec. 2, 2020, 1:40 PM), ECF No. 59-15.

Around the same time, Bryant contacted Kya Williams, a licensed

behavioral therapist, to begin the evaluation process for C.B.'s

participation in ABA therapy.  At Bryant's request and after Ms.

Williams assured Calvary that she had a classroom setting at her

behavioral clinic, Calvary agreed to allow C.B. to continue with

virtual instruction at Calvary during the spring 2021 semester as

long as he was supervised through Ms. Williams's ABA therapy

program.  Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 12, Email from

Koan to Bryant (Feb. 9, 2021, 11:32 AM), ECF No. 59-16.  Bryant

maintains that Headmaster Koan also agreed to allow C.B. to return

to campus in person as early as the first week of February 2021. Bryant Affidavit ¶ 40 (stating that Headmaster Koan said in December 2020 that C.B. could return to in person instruction at Calvary in February 2021).

At Bryant's request, C.B. continued with Calvary's virtual instruction program during the beginning of the spring 2021 semester. Ms. Williams supervised C.B. while he attended virtual classes. After observing C.B. during a few of his virtual classes, Ms. Williams told Calvary personnel that she had enough information to craft a therapy plan for C.B. A few weeks later, Ms. Williams met with Calvary personnel to present the therapy plan. The therapy plan included fifteen hours of in-person instruction at Calvary where an assistant would shadow C.B. during class to support implementation of the plan. Alternatively, Ms. Williams offered to train Calvary staff on ABA behavioral therapy techniques for free to help ensure that the therapy plan was implemented correctly.

Shortly after being briefed on the therapy plan, Headmaster Koan told Bryant that execution of the plan would not be possible because it required that C.B. return to campus in person. Email from Koan to Bryant (Feb. 9, 2021, 1:50 PM), ECF No. 59-16. According to Headmaster Koan, C.B.'s return to campus would only be possible if an ABA therapist provided the school with both a positive report of C.B. in a classroom setting other than Calvary

and evidence of his satisfactory progress in ABA therapy. *Id.*
Because the therapy plan required that C.B. return to Calvary in
person for fifteen hours per week, Headmaster Koan told Bryant
that they were at an "impasse." *Id.* Bryant subsequently ceased
communication with Calvary, and Calvary considered him "withdrawn
as a student" a short time later. Koan Decl. ¶ 21, ECF No. 49-2.

DISCUSSION

Bryant asserts the following claims against Calvary: (1)
failure-to-accommodate disability and disparate treatment claims
under the Rehabilitation Act; (2) a discriminatory discipline
claim under § 1981; and (3) a hostile educational environment claim
based on race under Title VI. The Court addresses each claim in
turn.

**I.   Rehabilitation Act Claims**

Section 504 of the Rehabilitation Act prohibits funding
recipients from discriminating against a person "solely by reason
of" his disability. 29 U.S.C. § 794(a). To establish
discrimination under the Rehabilitation Act, a plaintiff must show
that (1) he has a disability, (2) he is a qualified individual,
and (3) he was subjected to unlawful discrimination because of his
disability. *J.A.M. v. Nova Se. Univ.*, 646 F. App'x 921, 926 (11th
Cir. 2016) (per curiam) (citing *Cash v. Smith*, 231 F.3d 1301, 1305
(11th Cir. 2000)). Unlawful discrimination under the
Rehabilitation Act can include failing to provide accommodations

8

in certain circumstances. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412-13 (1979). Calvary contends that C.B. meets none of these requirements.

A.   Does C.B. Have a Disability?

To establish that C.B. has a disability, Bryant must establish that C.B. has "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or that C.B. was "regarded as having such an impairment" by Calvary.   42 U.S.C. § 12102(1)(A); 29 U.S.C. §§ 705(9)(B), (20)(B) (incorporating the Americans with Disabilities Act's definitions of "disability" and "individual with a disability").   Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."   42 U.S.C. § 12102(2)(A).   Here, Bryant contends that C.B.'s ADHD and autism substantially limit C.B.'s ability to learn, read, concentrate, and communicate. Calvary argues that C.B. is not an individual with a disability within the meaning of the Rehabilitation Act because Bryant did not point to evidence from which a factfinder could conclude that C.B.'s ADHD and autism substantially limit one or more of his major life activities.   The Court disagrees.

As a condition of enrolling in Calvary's Discovery School Program, Calvary required that Bryant submit a psychological evaluation report.  Accordingly, Bryant commissioned a clinical psychologist to conduct a psychological evaluation of C.B.  That evaluation determined that C.B. had ADHD and low-level autism because he presented with "symptoms of inattention and hyperactivity" and had difficulty with "maintaining reciprocal social interaction."  Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 32, Lifespan Psychology Report 4, ECF No. 60-24.  The evaluation also recommended that Calvary provide certain accommodations, such as repeated directions, preferential seating, and extra time because C.B. was "clearly" underperforming and "in need of academic support."  *Id.* at 5.  Based on the evaluation, Calvary crafted and distributed to C.B.'s teachers a Student Support Plan that listed C.B.'s learning differences and provided for certain accommodations to combat those hindrances.  Further, the undisputed evidence shows that Calvary repeatedly encouraged Bryant to have C.B. evaluated for medication to enable him to "focus and cooperate" in the classroom.  Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 8, Email from Jones to Bryant (Oct. 8, 2019, 11:02 AM), ECF No. 59-12; Jones Decl. ¶ 21.  Viewing this evidence in the light most favorable to Bryant, a reasonable factfinder could conclude that C.B. had a disability (or at least that Calvary

regarded C.B. as having a disability) within the meaning of the Rehabilitation Act.

### B.   Is C.B. a Qualified Individual?

The next question for the Court is whether C.B. was qualified to return to in-person classes at Calvary.   Under the Rehabilitation Act, an "otherwise qualified" individual is "one who is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. Coll.*, 442 U.S. at 406.   Calvary argues that C.B. was not "otherwise qualified" because of his misbehavior—which resulted in him being suspended for three days and eventually barred from in-person classes.   Bryant disagrees, arguing that C.B. was qualified because he met academic standards.   But satisfying academic standards alone is not enough to render an individual "otherwise qualified" under the Rehabilitation Act.   45 C.F.R. § 84.3(*l*)(4) (2023) (defining "qualified handicapped person" as one "who meets the essential eligibility requirements" of a program); *cf. Se. Cmty. Coll.*, 442 U.S. at 406 (explaining that in the context of postsecondary education, a "qualified handicapped person" is one who meets both academic and nonacademic admissions criteria that are essential to participation in the program).   Rather, an individual is not qualified if accommodating him requires an educational institution to "lower or . . . effect substantial modifications of [its] standards." *Se. Cmty. Coll.*, 442 U.S. at 413.

Accordingly, to determine if C.B. was qualified, the Court must assess whether Bryant's requested accommodations for C.B. would require Calvary to substantially modify or lower its standards.  If so, then Calvary was not required to provide them. Bryant asserts that Calvary denied C.B. the following accommodations: enforcement of the positive reinforcement behavior plan in Ms. Cameron's class, transferring C.B. to a teacher other than Ms. Cameron, and allowing C.B. to return to in-person classes at Calvary in the spring 2021 semester under the conditions of C.B.'s ABA behavioral therapy plan.  Because Bryant's requests all relied upon her disagreement with Calvary's disciplining of C.B. after he misbehaved, Bryant's accommodation request can be properly characterized as a request for Calvary to exempt C.B. from its normal disciplinary policy.

Bryant does not seriously dispute that C.B. violated Calvary's behavioral standards by throwing objects in class and misusing his laptop.  Nor does she dispute that Calvary considered C.B.'s acts to be disruptive and/or "harmful to [a] sense of classroom security."  Def.'s Statement of Undisputed Material Facts ¶ 43, ECF No. 49-1 (admitted in Pl.'s Resp. ¶ 43, ECF No. 59-3); Koan Dep. 145:7-19, 146:2-14, ECF No. 51.  Although Bryant argues that Calvary applied C.B.'s positive reinforcement plan inconsistently, Bryant does not contend that Calvary's progressive disciplinary responses to each incident were atypical punishments.

Nor does she point to evidence that Calvary had made similar exceptions for students who violated its behavioral standards in the past.  Therefore, the Court finds that exempting C.B. from Calvary's normal disciplinary policy would have required Calvary to substantially lower its behavioral standards.

Further, although Calvary did not grant all of Bryant's requests, the record is replete with adjustments that Calvary made for C.B. in an effort to accommodate him.  For example, Calvary implemented all of C.B.'s psychologist's recommendations, including his recommendation that C.B. be put on a behavior plan that incorporated positive rewards.  Indeed, Calvary pointed to evidence that C.B.'s teachers, including Ms. Cameron, were "more lenient" with him given this plan.  Cameron Dep. 31:13-19.  Even after Calvary dismissed C.B. from in-person classes, it adjusted the conditions of his dismissal to enable C.B. to return in person by fall 2021 without having to enroll in another school.  Email from Koan to Bryant (Dec. 2, 2020, 1:40 PM).  Specifically, Calvary allowed C.B. to continue attending Calvary through its virtual learning program for the rest of fall 2020 and granted Bryant's request to allow C.B. to continue learning virtually in spring 2021.  Calvary also granted Bryant's request to use the classroom at Ms. Williams's behavioral therapy clinic instead of enrolling him at a different school to satisfy Calvary's re-enrollment criteria that C.B. demonstrate "satisfactory progress" in a

"classroom setting." *Id.*  Although the virtual learning format
was not ideal for C.B., Calvary was not obliged to allow C.B.'s
return to in-person classes—even with an assistant or with the
benefit of ABA training of Calvary's staff—without evidence of an
improvement in his behavior.  Finding otherwise would require this
Court to substitute its judgment for the disciplinary decisions of
Calvary's administrators.  *See Davis ex rel. La Shonda D. v. Monroe
Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) (explaining that
courts should avoid "second-guessing the disciplinary decisions
made by school administrators").  Accordingly, the Court concludes
that Bryant did not establish that C.B. was qualified to return to
Calvary, even with Bryant's requested accommodations.  Calvary's
summary judgment motion on Bryant's Rehabilitation Act claims is
thus granted.

## II.  Race Discrimination Claims

In addition to her Rehabilitation Act claims, Bryant asserts
race discrimination claims under § 1981 and Title VI.  Bryant
appears to allege two separate theories: discriminatory discipline
under § 1981 and a racially hostile educational environment under
Title VI.  The Court addresses each claim in turn.

### A.  Did C.B. Receive Discriminatory Discipline?

Bryant contends that Calvary discriminated against C.B. when
it dismissed him without following the tiered disciplinary process

14

in the school's handbook.[1]  Section 1981 prohibits race discrimination "in the making and enforcement of public and private contracts," including contractual relationships between a private school and a student and his parents.  *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999)); *Blaine v. Savannah Country Day Sch.*, 491 S.E.2d 446, 448 (Ga. Ct. App. 1997) (recognizing that a contractual relationship exists between a private school and a student and the student's parents under Georgia law).  To sustain a § 1981 claim, a plaintiff must prove intentional discrimination.  *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994).  Intentional discrimination may be established through direct or circumstantial evidence.  *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc).

Where, as here, a plaintiff offers no direct evidence of discrimination, the Court may evaluate the plaintiff's claims using the familiar *McDonnell Douglas* burden-shifting framework.

---

[1] Calvary's expulsion policy provides:

> At the discretion of the Administration, a student who has demonstrated persistent or significant discipline problems and has not adequately responded to school guidance or correction, may be expelled or asked to withdraw. A student who is dismissed from [Calvary] will not be considered for re-enrollment for a period of one year from the date of departure.

Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 1, Calvary 2020-2021 Student Handbook 16, ECF No. 59-5.

*Stanislaus v. Emory Univ.*, 255 F. App'x 459, 460 (11th Cir. 2007) (per curiam) (applying the *McDonnell Douglas* burden-shifting framework, which originated in the employment context, to a § 1981 race discrimination claim brought by a student against a private university following the university's punishment of the student); *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 927–28 (11th Cir. 2013) (per curiam) (same).  Under that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Lewis*, 918 F.3d at 1220.  If a plaintiff can establish the elements of a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action.  *Id.* at 1221.  If the defendant articulates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination."  *Id.*

To establish a prima facie case of discrimination, Bryant must show that (1) C.B. is a member of a protected class, (2) he suffered an adverse action, (3) he was qualified to attend Calvary within the meaning of § 1981, and (4) Calvary "treated 'similarly situated' [students] outside his class more favorably."  *Id.* at 1220-21.  The parties do not dispute that C.B., a black male, is a member of a protected class, that he was qualified within the meaning of § 1981, or that he suffered an adverse action when

16

Calvary dismissed him.  Calvary argues that it is entitled to summary judgment because Bryant failed to identify a similarly situated comparator who was treated more favorably.

To establish the fourth element of her prima facie case, Bryant must show that C.B. and her proffered comparators are "similarly situated in all material respects." *Id.* at 1218.  To be "similarly situated," the comparator generally needs to have engaged in the same basic misconduct and shared a similar disciplinary history as the plaintiff. *Id.* at 1227-28.  Bryant did not identify any student outside C.B.'s protected class who engaged in the same basic misconduct and shared C.B.'s disciplinary history yet was punished less harshly than C.B.  Relying on hearsay, Bryant points to one student who tried to attack Calvary's principal yet—based on Bryant's perception—was not punished as harshly as C.B.  Bryant Dep. 305:13-19.  Bryant contends that Calvary's principal told her that after Calvary set the student up with ABA services, the student improved and eventually graduated. *Id.*  But Bryant does not point to evidence that the student was outside C.B.'s protected class.  Even if Bryant had shown that the student was outside C.B.'s protected class, she did not point to evidence that the student was treated less harshly than C.B. or that the school followed a tiered disciplinary process with that student but not C.B.  Indeed, Bryant's own testimony shows that the student's behavior improved with the help of ABA services,

which was the same condition Calvary imposed on C.B. before he could return to campus. *Id.*

Additionally, Bryant contends that two white students in C.B.'s Discovery School class made racially charged comments in a virtual meeting yet were not dismissed from Calvary. But Bryant did not point to evidence that these students had a similar disciplinary history to C.B. Although the Court agrees that making racially charged comments is unacceptable, that alone does not make the two students' misconduct materially similar to C.B.'s. Bryant does not dispute that C.B. caused classroom disruptions that made others feel unsafe on multiple occasions. She did not proffer any comparators with a similar pattern of misconduct. Accordingly, because Bryant did not show that the proffered comparators were similarly situated to C.B. in all material respects, her prima facie case for discriminatory discipline fails.

Even if Bryant had established a prima facie case, Calvary contends that it dismissed him for legitimate, nondiscriminatory reasons, including (1) C.B.'s history of property destruction, (2) Bryant's lack of progress in securing ABA therapy for C.B., (3) Bryant's refusal to have C.B. evaluated for potential medication needs, and (4) C.B.'s continued behavioral problems in the virtual setting. Because Calvary articulated nondiscriminatory reasons for its decision to dismiss C.B., the burden shifts back to Bryant

to demonstrate that the proffered reasons are not the true reasons, but instead are a pretext for discrimination.  The Court finds that no reasonable jury could find that Calvary's reasons for dismissing C.B. were pretextual.

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendants] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1274 (11th Cir. 2017) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  The plaintiff must rebut the defendant's proffered reasons "head on" and cannot succeed by "quarreling with the wisdom" of the reasons. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  Bryant did not meet this burden.

As an initial matter, the Court notes that Bryant did not directly address pretext in her response brief, but she does attempt to cast doubt on the veracity of C.B.'s disciplinary history based on how Calvary recorded C.B.'s behavior and the timing of those records.  The Court understands this attempt to cast doubt as a pretext argument.  Nevertheless, the Court is not persuaded.  First, Bryant attempts to cast doubt on the veracity of C.B.'s disciplinary history by pointing to peculiarities in Calvary's method of maintaining records.  To support that argument,

she points to a Microsoft Word document describing C.B.'s
misconduct throughout his time at Calvary. *See* C.B. Behavior Log,
ECF No. 59-24.  The document includes additional incidents of
misbehavior other than the three that were formally recorded in
Calvary's academic portal.  Bryant speculates that Calvary's
recording of C.B.'s misbehavior in the academic portal coincides
with her complaints about racial discrimination at the school.
But, again, Bryant does not seriously dispute that C.B. engaged in
three instances of misbehavior that caused classroom disruptions
and made others feel unsafe.  Based on Calvary's Student Handbook,
it was well within Calvary's discretion to discipline C.B. given
this pattern of misbehavior.  Calvary 2020-2021 Student Handbook
16 ("*At the discretion of the Administration*, a student who has
demonstrated persistent or significant discipline problems and has
not adequately responded to school guidance or correction, may be
expelled or asked to withdraw." (emphasis added)).  Accordingly,
putting aside C.B.'s more extensive disciplinary history that was
not formally recorded, the record does not support Bryant's
contention that jury questions exist regarding the veracity of
C.B.'s disciplinary history.

Bryant also argues that the timing of C.B.'s misbehavior
(September 14, 2020; October 8, 2020; and November 20, 2020)
signals that external factors caused C.B. to act out.
Specifically, she contends that the increasingly racially hostile

environment at Calvary exacerbated C.B.'s disability
manifestations, which led to his outbursts in class.  While the
Court recognizes the logic of this argument, it does not show that
Calvary's asserted reasons for dismissing C.B. were pretextual,
especially given Calvary's progressive discipline of C.B. after
each behavioral incident (first checkmark, then suspension, then
removal from in-person classes).  Calvary has an interest in
securing a safe classroom environment for its students and
teachers.  And, again, Bryant does not seriously dispute that Koan
considered C.B.'s outbursts to be disruptive and harmful to a sense
of classroom security.  Accordingly, Bryant has failed to show
that Calvary's proffered reasons were false and that the real
reason for C.B.'s dismissal was race.  Therefore, Calvary is
entitled to summary judgment on Bryant's § 1981 claim.

B.   Did Calvary Create a Racially Hostile Environment?

Finally, Bryant contends that C.B. was subject to a racially
hostile educational environment and that Calvary was deliberately
indifferent to it in violation of Title VI.  Title VI prohibits
programs that receive federal funds from intentionally
discriminating against participants "on the ground of race."  42
U.S.C. § 2000d.  To prove race discrimination under a hostile
educational environment theory, the plaintiff must prove that the
defendant was deliberately indifferent to harassment so "severe,
pervasive, and objectively offensive that it effectively bars the

victim's access to an educational opportunity or benefit." *Monroe Cnty. Bd. of Educ.*, 526 U.S. at 633.[2]  The Court finds that the conduct Bryant contends was harassment does not meet this standard.

Here, Bryant contends the following conduct is actionable racial harassment: (1) student comments in a virtual meeting about "God hating blacks and gays;" (2) Director Jones's comment to Bryant that C.B. needs to be careful or he "would end up with his hands behind his back;" (3) Calvary's repeated encouragement that Bryant have C.B. evaluated for medication; and (4) Calvary forcing another black male student to withdraw from the school.

The Court finds that this conduct does not rise to the level of actionable racial harassment.  Although the comments made by the students are offensive and the Court understands how Director Jones's comments could be interpreted as insensitive, the Court finds that these isolated comments are not sufficiently pervasive such that they effectively denied C.B. equal access to education. *See Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1288 (11th Cir. 2003) (concluding, in the Title IX context, that a student's conduct was sufficiently "persistent" when he made sexually explicit remarks to female students "on a frequent basis for

---

[2] Although *Monroe County Board of Education* involved a Title IX violation, "Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (citations omitted).  Accordingly, the Court uses Title IX caselaw for guidance in evaluating Bryant's Title VI claim.

several months"); *cf. Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1251–54 (11th Cir. 2014) (finding, in the Title VII context, that plaintiffs who were exposed to racially harassing conduct "every morning," "every day," "regularly," or "all the time" had experienced pervasive and severe harassment).

As to Calvary's repeated encouragement that Bryant have C.B. evaluated for potential medication, Bryant has not shown that this conduct was objectively offensive or race-related, especially given Calvary's desire to more effectively manage C.B.'s repeated classroom disruptions and Dr. Weis's independent recommendation that C.B. be evaluated by a physician.   Lastly, while Bryant contends that Calvary forced another black male Discovery School student to withdraw from Calvary around the same time C.B. withdrew, the evidence she points to suggests that the student was given an out-of-school suspension because he had engaged in "excessive horseplay[]" that involved "grabbing students and throwing them down to the ground."   Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 34, Student Comparator Data 22, ECF No. 60-26.   The student withdrew from Calvary a short time later.   *Id.* at 8. Bryant has simply not pointed to evidence that Calvary targeted this student or C.B. based on race.   Indeed, Bryant does not dispute that Calvary also expelled at least four white students and barred two others from in-person classes during C.B.'s time at the school.   Accordingly, because Bryant failed to create a genuine

factual dispute as to whether Calvary subjected C.B. to a racially hostile educational environment, Calvary is entitled to summary judgment on Bryant's Title VI claim.

CONCLUSION

For the foregoing reasons, Calvary's Motion for Summary Judgment (ECF No. 49) is granted.  Because the Court grants Calvary's summary judgment motion, Calvary's motion to exclude Bryant's expert is terminated as moot (ECF No. 50).


IT IS SO ORDERED, this 7th day of August, 2023.

S/Clay D. Land
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA